# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CLARENCE GIBSON                                          CIVIL ACTION

VERSUS                                                    NO. 23-7269

E. DUSTIN BICKHAM, WARDEN                          SECTION: "L"(1)

## REPORT AND RECOMMENDATION

Petitioner, Clarence Gibson, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On February 12, 2009, petitioner was convicted of sexual battery under Louisiana law.[1] On April 3, 2009, he was sentenced to twenty-five years imprisonment without benefit of parole, probation, or suspension of sentence.[2] On March 9, 2010, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence,[3] and the Louisiana Supreme Court then denied his related writ application on November 5, 2010.[4] He did not file a petition for certiorari in the United States Supreme Court.[5]

However, on May 2, 2011, petitioner, through counsel, filed an application for post-conviction relief with the state district court.[6] That application was denied on June 15, 2011.[7] His

---

[1] Rec. Doc. 53-1, pp. 24, 59, and 392.
[2] Rec. Doc. 53-1, pp. 74 and 405-06.
[3] Rec. Doc. 53-1, pp. 727-43; State v. Gibson, 38 So. 3d 373 (La. App. 5th Cir. 2010).
[4] Rec. Doc. 53-1, p. 832; State v. Gibson, 50 So. 3d 814 (La. 2010).
[5] Rec. Doc. 34, p. 3, Answer to Question No. 9(h).
[6] Rec. Doc. 53-1, pp. 839-53.
[7] Rec. Doc. 53-1, pp. 859-60.

related writ application was thereafter denied by the Louisiana Fifth Circuit Court of Appeal on July 29, 2011,[8] and he did not seek further review by the Louisiana Supreme Court.

Petitioner then ceased his efforts to obtain relief for almost a decade.  Then, on April 12, 2021, petitioner, through counsel, filed a second application for post-conviction relief with the state district court.[9]  That application was denied on April 15, 2021,[10] and his related writ applications were likewise denied by the Louisiana Fifth Circuit Court of Appeal on June 28, 2021,[11] and by the Louisiana Supreme Court on January 25, 2023.[12]

In March of 2023, petitioner filed with the state district court a motion for reconsideration of sentence.[13]  That motion was denied on March 20, 2023.[14]  He also filed a related supplement,[15] which was denied on April 4, 2023.[16]  The Louisiana Fifth Circuit Court of Appeal likewise denied a related writ application on May 19, 2023.[17]

In October of 2023, petitioner then filed with the state district court a motion to correct an illegal sentence.[18]  That motion was denied on October 25, 2023.[19]

---

[8] Rec. Doc. 53-2, pp. 956-64; State v. Gibson, No. 11-KH-714 (La. App. 5th Cir. July 29, 2011).

[9] Rec. Doc. 53-1, pp. 907-59.

[10] Rec. Doc. 53-1, p. 1013.

[11] Rec. Doc. 53-2, pp. 96-97; State ex rel. Gibson v. Hooper, No. 21-KH-369 (La. App. 5th Cir. June 28, 2021)

[12] Rec. Doc. 53-2, p. 273; State ex rel. Gibson v. Hooper, 354 So. 3d 11 (La. 2023).  While that Louisiana Supreme Court writ application was pending, petitioner also contemporaneously continued to seek relief in the state district court.  For example, in August of 2022, he filed a pro se application for a post-conviction plea agreement, Rec. Doc. 53-2, pp. 200-07, and that application was denied that same month, id. at p. 208.  In September of 2022, he then filed additional requests for post-conviction relief and a motion for correction of illegal sentence, id. at pp. 210-41, and those requests were denied the following month, id. at pp. 242 and 246.

[13] Rec. Doc. 53-2, pp. 369-79.

[14] Rec. Doc. 53-2, p. 385.

[15] Rec. Doc. 53-2, pp. 387-89.

[16] Rec. Doc. 53-2, p. 390.

[17] Rec. Doc. 53-2, pp. 401-02; Gibson v. State of Louisiana, No. 23-KH-207 (La. App. 5th Cir. May 19, 2023).

[18] Rec. Doc. 53-2, pp. 424-27.

[19] Rec. Doc. 53-2, p. 428.

Meanwhile, throughout 2022 and 2023, petitioner repeatedly sought relief in the state's superior courts in a series of improper filings which seemingly did not directly correspond to filings and rulings in the state district court.  For example, he filed a writ application directly with the Louisiana Supreme Court, which that court refused to consider.[20]  He then filed two writ applications with the Louisiana Fifth Circuit Court of Appeal which were denied,[21] as were his related writ applications filed with Louisiana Supreme Court.[22]  He also filed a writ application with the Louisiana Fifth Circuit Court of Appeal which was denied,[23] and a related writ application with the Louisiana Supreme Court, which that court refused to consider because it was not timely filed.[24]

Petitioner then began seeking relief in federal court in a similarly haphazard manner.  Specifically, on June 13, 2023, he instituted this proceeding by filing an application for habeas corpus relief in the United States District Court for the Western District of Louisiana.[25]  Over the next six months, he then proceeded to file a flurry of related documents and amendments.[26]  Eventually, in December of 2023, the matter was transferred to the Eastern District of Louisiana.[27]

At that point, the undersigned United States Magistrate Judge noted that the state had not been given an opportunity to file a response in the Western District.  The undersigned further noted

[20] Rec. Doc. 53-2, p. 245; State v. Gibson, 348 So. 3d 76 (La. 2022).
[21] Rec, Doc. 53-2, pp. 355 and 359; Gibson v. 24th Judicial District Court, No. 23-KH-36 (La. App. 5th Cir. Feb. 13, 2023); Gibson v. 24th Judicial District Court Section B, No. 23-KH-37 (La. App. 5th Cir. Feb. 13, 2023).
[22] Rec. Doc. 53-2, pp. 1420 and 1439; Gibson v. 24th Judicial District Court, 361 So. 3d 464 (La. 2023); Gibson v. 24th Judicial District Court Section B, 361 So. 3d 464 (La. 2023).
[23] Rec. Doc. 53-2, p. 259; Gibson v. Campbel, No. 22-KH-533 (La. App. 5th Cir. Dec. 7, 2022).
[24] Rec. Doc. 53-2, p. 1380; Gibson v. Campbel, 361 So. 3d 469 (La. 2023).
[25] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner has declared under penalty of perjury that his original federal application was placed in the prison mailing system on June 13, 2023. Rec. Doc. 1, p. 8.
[26] Rec. Docs. 5, 6, 7, 8, 10, 12, 15, 16, 18, 19, 20, 21, 23, and 24.
[27] Rec. Doc. 25; Gibson v. Bickham, Civ. Action No. 5:23-CV-0086, 2023 WL 8607017 (W.D. La. Dec. 8, 2023).

that, given petitioner's disjointed jumble of filings after his initial filing, the state could not reasonably be expected to formulate a response until some order had been brought to the filings. Therefore, petitioner was ordered to file an amended and superseding petition incorporating all claims he intended to pursue in this proceeding.[28]  Petitioner initially complied with that order,[29] although he thereafter also continually sought to further amend his pleading in various respects.[30]

In any event, the state has now filed its response in this matter, arguing that petitioner's federal application seeking habeas corpus relief should be dismissed on the grounds that it is "grossly untimely."[31]  Petitioner has expressly disputed the contention that his federal application is untimely.[32]  However, for the following reasons, it is abundantly clear that the state is correct, in that petitioner's federal application was filed more than eleven years too late.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a statute of limitations for petitioners seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Specifically, the AEDPA provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[28] Rec. Doc. 27.
[29] Rec. Docs. 34 and 37.
[30] Rec. Docs. 42, 43, 45, 51, 54, 56, and 57.
[31] Rec. Doc. 52.
[32] See, e.g., Rec. Doc. 42.

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Because petitioner does not allege the existence of a state-created impediment, a newly recognized and retroactively applicable constitutional right, or a newly discovered factual predicate, Subsections B, C, and D are inapplicable in the instant case.[33]  Accordingly, Subsection A controls,[34] and so petitioner's federal limitations period commenced on the date his state court judgment became final.

With respect to determining that date of finality, the United States Fifth Circuit Court of Appeals has explained:

The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

---

[33] The Court notes that one of petitioner's claims is based on Ramos v. Louisiana, 140 S. Ct. 1390 (2020), in which the United States Supreme Court held that a state jury must be unanimous to convict a criminal defendant of a serious offense.  However, the United States Supreme Court subsequently held that Ramos was **not** retroactively applicable to cases on collateral review.  Edwards v. Vannoy, 141 S. Ct. 1547 (2021).  Accordingly, Subsection C is not triggered by petitioner's Ramos claim.  See, e.g., Oates v. Louisiana State, Civil Action No. 21-1610, 2022 WL 972262, at *2 (E.D. La. Mar. 31, 2022); see also Staton v. Daquilla, Civ. Action No. 20-164, 2023 WL 2518909, at *3 n.30 (M.D. La. Feb. 9, 2023), adopted, 2023 WL 2507575 (M.D. La. Mar. 14, 2023), certificate of appealability denied, No. 23-30216, 2023 WL 6871676 (5th Cir. Aug. 2, 2023); Maxie v. Warden, Civil Action No. 5:22-CV-01832, 2023 WL 2804783, at *2 (W.D. La. Jan. 24, 2023), adopted, 2023 WL 2802237 (W.D. La. Apr. 5, 2023).

[34] Out of an abundance of caution, the undersigned notes that the state expressly argues that Subsection A applies, Rec. Doc. 52, p. 9, and that petitioner appears to agree, see Rec. Doc. 42, p. 1, and Rec. Doc. 54, p. 5.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Therefore, petitioner's state criminal judgment became final for federal purposes on February 3, 2011, i.e. ninety days after the Louisiana Supreme Court denied his direct-review writ application on November 5, 2010.[35]   Accordingly, in order to be timely, his federal application had to be filed within one year of that date, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the limitations period set forth in § 2244(d)(1), federal law provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

After eighty-seven (87) days elapsed, petitioner did indeed toll the federal limitations period in his case by filing a post-conviction application with the state district court on May 2, 2011.[36]  Moreover, although that application was denied by the district court, it nevertheless remained "pending" for § 2244(d)(2) purposes for the duration of the post-conviction proceedings, so long as petitioner continued to seek review at the higher levels of the state court system in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004).

---

[35] Rec. Doc. 53-1, p. 832; State v. Gibson, 50 So. 3d 814 (La. 2010).  Throughout this proceeding, petitioner has argued that his one-year limitations period did not begin to run until after the Louisiana Supreme Court denied him post-conviction relief in 2023.  See, e.g., Rec. Doc. 1, p. 7, answer to Question No. 18; Rec. Doc. 34, p. 13, answer to Question No. 18; Rec. Doc. 37, p. 13, answer to Question No. 18; Rec. Doc. 42, pp. 1-2; Rec. Doc. 54, p. 5.  He is incorrect.  Under 28 U.S.C. § 2244(d)(1)(A), a petitioner's one-year limitations period runs from the completion of **direct (not collateral)** review.  See, e.g., Flanagan v. Johnson, 154 F.3d 196, 199 n.1 (5th Cir. 1998); Fields v. Hooper, Civ. Action No. 23-2268, 2023 WL 9119781, at *4 (E.D. La. Dec. 19, 2023), adopted, 2024 WL 81485 (E.D. La. Jan. 8, 2024); Schaffer v. Rayburn Correctional Center, Civ. Action No. 22-294, 2022 WL 3223987, at *6 (E.D. La. July 7, 2022), adopted, 2022 WL 3214542 (E.D. La. Aug. 9, 2022).
[36] Rec. Doc. 53-1, pp. 839-53.

Here, after the state district court denied relief,[37] petitioner sought review by the Louisiana Fifth Circuit Court of Appeal, and the state does not dispute the timeliness of that related writ application. Once the Court of Appeal denied the writ application on July 29, 2011,[38] petitioner then had thirty (30) days to file a Louisiana Supreme Court writ application seeking further review. Louisiana Supreme Court Rule X, § 5(a). However, he did **not** seek further review by the Louisiana Supreme Court, and so his post-conviction application finally ceased to be pending – and statutory tolling therefore ended – on **August 29, 2011**,[39] when his time for seeking such further review expired. See Grillette, 372 F.3d at 771 (a state application ceases to be pending for tolling purposes when the time for seeking supervisory review expires).

Once the limitations period resumed running at that point, petitioner had two hundred seventy-eight (278) days of his one-year limitations period remaining. Accordingly, he had until **June 4, 2012**,[40] either to again toll the limitations period or to file his federal application.

Petitioner had no other applications pending before the state courts at any time on or before June 4, 2012.[41] Therefore, he clearly is not entitled to further **statutory** tolling.

---

[37] Rec. Doc. 53-1, pp. 859-60.

[38] Rec. Doc. 53-2, pp. 956-64; State v. Gibson, No. 11-KH-714 (La. App. 5th Cir. June 29, 2011).

[39] Because the thirtieth day of the thirty-day period fell on a Sunday in this case, petitioner had until Monday, August 29, 2011, to file a writ application. See La. Code Crim. P. art. 13; La. Rev. Stat. Ann. § 1:55.

[40] Because the three hundred sixty-fifth day of the limitations period fell on a Saturday, petitioner's deadline was extended until Monday, June 4, 2012. See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed. R. Civ. P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

[41] Although he began seeking relief in the state courts again many years later in 2021, that is immaterial. Pleadings filed in the state courts after the expiration of the federal statute of limitations have no bearing on § 2244(d)(2) tolling determinations. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). This is so because once the federal limitations period has expired, "[t]here [i]s nothing to toll." Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).

But the Court must also consider whether petitioner is entitled to **equitable** tolling.  The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 645 (2010).  However, "equitable tolling is unavailable in most cases …."  Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").  Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing."  Holland, 560 U.S. at 649 (internal quotation marks omitted).  A petitioner bears the burden of proof to establish entitlement to equitable tolling.  Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).  In the instant case, petitioner has brought forth no evidence whatsoever demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, it must also be noted that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013).  In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).  In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims.  Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996.  Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in

> Schlup and House, or, as in this case, expiration of the statute of limitations.  We
> caution, however, that tenable actual-innocence gateway pleas are rare:  "[A]
> petitioner does not meet the threshold requirement unless he persuades the district
> court that, in light of the new evidence, no juror, acting reasonably, would have
> voted to find him guilty beyond a reasonable doubt."  Schlup, 513 U.S., at 329, 115
> S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup
> standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

Here, petitioner does in fact argue that his application is not time-barred because he is

actually innocent.[42]  However, for the follow reasons, he has not made the showing required under

Perkins for a tenable claim of actual innocence.

As noted, petitioner was convicted of sexual battery.  At the time of his crime, La. Rev.

Stat. Ann. § 14:43.1(A) defined that offense as follows:[43]

> Sexual battery is the intentional engaging in any of the following acts with another
> person where the offender acts without the consent of the victim, or where the act
> is consensual but the other person, who is not the spouse of the offender, has not
> yet attained fifteen years of age and is at least three years younger than the offender:
>
> (1) The touching of the anus or genitals of the victim by the offender using
> any instrumentality or any part of the body of the offender; or
> (2) The touching of the anus or genitals of the offender by the victim using
> any instrumentality or any part of the body of the victim.

In assessing a claim of actual innocence, a court normally first examines the evidence

presented at trial and on which the petitioner's conviction was based.  See, e.g., Johnson v. Cain,

Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x

474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La.

---

[42] Rec. Doc. 42, pp. 2-3.
[43] La. Rev. Stat. Ann. § 14:43.1 was subsequently amended.

Sept. 17, 2014).  In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that

evidence as follows:

> On November 9, 2007, Detective Jason Dimarco of the Gretna Police
> Department responded to a complaint at a Gretna elementary school.  When he
> arrived at the school, Detective Dimarco learned that "a young nine year old young
> [sic] lady there at the school ... [had] disclosed to a teacher that someone was
> touching her inappropriately."  Danielle, the victim, told Detective Dimarco that
> the defendant "had [touched her] in a nasty way, and that she had been touched on
> her private parts."[FN 1]  Detective Dimarco interviewed the victim at the school.
> Detective Dimarco testified that he established that Danielle was nine years old
> during the interview.  Detective Dimarco also learned that the defendant was the
> boyfriend of Danielle's mother.  The defendant arrived at the school shortly
> thereafter.  After arriving at the school, the defendant asked to speak to Danielle
> alone.  Detective Dimarco denied the request.

>> [FN 1]  In accordance with La. R.S. 46:1844, the victim and her family members
>> will be referred to by the use of pseudonyms in order to protect their identities.
>> See also State v. Myles, 04-677 (La.App. 5 Cir. 1/25/05), 894 So.2d 515, 528.

> Detective Dimarco asked the defendant to accompany him to the police
> station.  The defendant agreed.  Detective Dimarco thereafter began to interview
> the defendant at the Gretna Police station.  However, the defendant refused to sign
> a waiver of rights form, which caused Detective Dimarco to terminate the
> discussion.  Detective Dimarco testified that another Gretna Police officer escorted
> Danielle's mother out of the apartment that she shared with the defendant on the
> evening of November 9, 2007.
> Detective Dimarco scheduled a forensic interview of the victim by an
> interviewer from the Jefferson Parish Child Advocacy Center.  Erika Dupepe
> conducted the interview for the Child Advocacy Center.[FN 2]  After reviewing the
> results of the interview with the Child Advocacy Center representative, Detective
> Dimarco obtained an arrest warrant for the defendant.  The defendant turned
> himself in to police voluntarily.

>> [FN 2]  Detective Dimarco identified "Erica Slakich" as the Child Advocacy
>> Center employee who interviewed Danielle.  We assume that "Erica Slakich" and
>> Erica Dupepe are the same person, as Ms. Dupepe later testified that she
>> interviewed Danielle and a curriculum vitae for "Erica Slakich Dupepe" is
>> contained in the record.

> Danielle's elementary school teacher testified at trial.  On November 9,
> 2007, Danielle told her teacher that "daddy is touching me on the booty, and I know
> he is not supposed to be doing that."  Danielle's teacher asked Danielle how long
> the defendant had been doing that.  Danielle replied that the defendant had been

"touching her booty" since Hurricane Katrina. Danielle also noted that "today he did something different." Danielle's teacher described Danielle as "a little bit distraught." Danielle's teacher thereafter took Danielle to the principal's office. She then informed the principal of her conversation with Danielle. Danielle's teacher recalled that after the events of November 9, 2007, Danielle transferred to another school.

Adrian Piper-Key is a social worker for the Jefferson Parish Department of Social Services. She interviewed the victim on November 9, 2007. Ms. Piper-Key testified that she found Danielle to be "very credible in what she was telling me" and that she notified Danielle's mother as to Danielle's allegations. Ms. Piper-Key interviewed other members of Danielle's household and thereafter turned the case over to the Jefferson Parish family services unit.

Erika Dupepe testified that at the time of this incident, she was employed by the City of Gretna's Child Advocacy Center as a forensic interviewer. Ms. Dupepe interviewed the victim on November 13, 2007. According to Ms. Dupepe, the victim told her that the defendant began abusing her when she was "seven or eight years old."

Dr. Scott Benton was accepted by the trial court as an expert in the field of pediatric forensic medicine with a subspecialty in sexual maltreatment. Dr. Benton interviewed and conducted a comprehensive pediatric physical examination of Danielle on November 26, 2007. Danielle told Dr. Benton that she was nine years old. Dr. Benton testified that the physical exam showed no physical findings of sexual abuse and that Danielle's hymen was intact. In addition, Dr. Benton found no evidence of any sexually transmitted disease. Dr. Benton testified that the lack of physical evidence does not rule out the possibility of sexual penetration. Dr. Benton additionally testified that the possibility of finding physical evidence in a sexual assault victim decreases greatly after 72 hours. On cross-examination, Dr. Benton admitted that "[t]here is no physical evidence to my knowledge in this case." The DVD of Dr. Benton's interview with Danielle was played before the jury.

Sandra, the victim's mother, testified that she had known the defendant since she was twelve or thirteen. Sandra and the defendant began "courting" when both were about fourteen years old. Sandra testified that she and the defendant had remained in an intermittent romantic relationship thereafter. Sandra began living with the defendant in 2004. Sandra noted that the defendant is the biological father of two of her children. The defendant is not the biological father of Danielle.

After Hurricane Katrina, Sandra evacuated to Mississippi with the defendant and Danielle. Sandra, the defendant, and Danielle spent approximately 3 weeks in Mississippi. Subsequently, they relocated to Baldwin, Louisiana. Sandra, the defendant, and Danielle also spent time in Pasadena, Texas and Jackson, Mississippi. In the latter months of 2005, Sandra and the defendant returned to New Orleans. Danielle remained in Jackson, Mississippi so that she could attend school there. Sandra testified that she and the defendant would visit Danielle every other week. Eventually, Sandra, Danielle, and the defendant settled

11

in an apartment building in Gretna, Louisiana. Sandra's mother, sister, and sister's boyfriend lived in the Gretna apartment intermittently in 2007.

On November 9, 2007, Sandra was employed by a gas station in Gretna. She often worked night shifts, leaving the defendant at home with Danielle and her younger sister. Sandra testified that on November 9, 2007, police officers told her to report to Gretna Park Elementary. She complied. When she arrived at the school, Danielle and the defendant were already present. After learning of the nature of Danielle's accusations, Sandra returned to her apartment, packed her belongings, and moved in with her sister in New Orleans. Sandra testified that she had had no contact with the defendant after November 9, 2007.

Danielle testified at trial. She told the jury that her birthday was October 7, 1998. Danielle testified that "things" started happening to her after Hurricane Katrina when she was "seven, eight, and nine." Danielle testified that she had lived in many places after Hurricane Katrina. Danielle was asked if "things [happened] to [her] at some of those places." Danielle replied: "Yes."

According to Danielle, the defendant would put "his private in my private, and he would put his private in my butt, and he would make me play with his private with my hand, and he would use spit for his private to put in my butt and my private ..." Danielle testified that the defendant placed his "private" on the "inside" and the "outside" of her "private." Danielle also indicated that the defendant would "lick me on my private" occasionally. Danielle testified that "yellow stuff" came out of the defendants [sic] "private" and that the "yellow stuff" would run down her legs.

Danielle testified that the defendant told her not to tell anybody else what he was doing. Danielle eventually described the defendant's conduct to her friends and Ms. Bourgeois. Danielle recalled speaking to several additional people about the defendant's conduct.

Rachel, the defendant's sister, testified for the defense. Rachel told the jury that she was very close with her brother and Sandra. Rachel confirmed that Sandra, the defendant, and Danielle lived in Mississippi, Texas, and Louisiana immediately after Hurricane Katrina. Rachel often spent time visiting Sandra, Danielle, and the defendant with her fiancée and her three children. Rachel never saw the defendant engage in any inappropriate activity with Danielle.

Tammy testified for the defense. Tammy is another of the defendant's sisters. Tammy recalled that the defendant, Sandra, and Danielle moved frequently after Hurricane Katrina. Tammy lived with the defendant and Danielle for a time in Pasadena, Texas with numerous other people. Tammy never saw the defendant engage in any inappropriate behavior with Danielle. Tammy also noted that the defendant was a stricter disciplinarian than Sandra.

The defense recalled Sandra to the witness stand. Sandra admitted that Danielle had never mentioned to her that the defendant had touched her inappropriately, even though she described the two as very close. Sandra noted that her sister and her sister's boyfriend had lived with herself, Danielle, and the defendant periodically after Hurricane Katrina. Sandra testified that neither her

sister nor her sister's boyfriend detected anything unusual while they were living at the Gretna apartment in 2007. Sandra recalled that prior to Danielle's complaint about the defendant's sexual misconduct, she received a letter from Danielle's biological father and that she read the letter aloud to Danielle and the defendant. Sandra could not recall when she received the letter.

The defendant testified that the week before Danielle's allegations, he watched an adult film with Sandra and that he left the DVD in the apartment. The defendant denied engaging in sexual misconduct with Danielle.[44]

Because ample evidence of petitioner's guilt was introduced at trial, he obviously faces a substantial challenge to establish a viable "actual innocence" claim. In fact, to do so, he must present the Court with new evidence of his innocence – and that new evidence must be particularly compelling. Indeed, the United States Fifth Circuit Court of Appeals has explained:

> This exception's demanding standard requires evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error. The standard is seldom met.
>
> An actual-innocence claim is only established when it is shown that, in the light of newly-discovered evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Therefore, a credible claim must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Actual innocence is then demonstrated only when the court scrutinizes the likely impact on reasonable jurors of the overall, newly supplemented record to conclude that, in the light of all evidence – both the evidence presented at trial and that newly discovered – no juror, acting reasonably, would have voted to find petitioner guilty beyond a reasonable doubt.

Floyd v. Vannoy, 894 F.3d 143, 154-55 (5th Cir. 2018) (citations, quotation marks, and brackets omitted).

---

[44] Rec. Doc. 53-1, pp. 729-34; State v. Gibson, 38 So. 3d 373, 375-77 (La. App. 5th Cir. 2010).

Here, although petitioner contends that he is innocent, he has presented **no new evidence whatsoever** in support of that contention. Accordingly, he has not met "the threshold requirement" for <u>Perkins</u> to apply. <u>Perkins</u>, 569 U.S. at 386.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that the <u>Perkins</u> "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than **June 4, 2012**, in order to be timely. Because his application was not filed until **June 13, 2023**, it was untimely by more than **eleven years**.

### **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Clarence Gibson be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___10th___ day of April, 2024.


_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

14